Anthony J. Oncidi (State Bar No. 118135)
aoncidi@proskauer.com
Robert H. Horn (State Bar No. 134710)
rhorn@proskauer.com
Susan L. Gutierrez (State Bar No. 273980)
sgutierrez@proskauer.com
Christopher L. Williams (*admitted pro hac vice*)
cwilliams@proskauer.com
PROSKAUER ROSE LLP
2049 Century Park East
32nd Floor
Los Angeles, California 90067-3206
Telephone:   (310) 557-2900
Facsimile:    (310) 557-2193

Attorneys for Plaintiff and Counterdefendant Aaron L. Mintz
and Counterdefendant Creative Artists Agency, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| AARON L. MINTZ, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MARK BARTELSTEIN & ASSOCIATES, INC., d/b/a Priority Sports & Entertainment; and MARK BARTELSTEIN, an individual,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. CV12-2554 SVW(SSx) (Consolidated with Case No. CV12-3055 SVW (SSx))<br><br>**MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF PLAINTIFF'S AND COUNTERDEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:        October 29, 2012<br>Time:       1:30 p.m.<br>Ctrm:       6<br><br>Hon. Stephen V. Wilson<br><br>Pretrial Conf:   October 29, 2012<br>Trial:              November 13, 2012 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................... 1

BACKGROUND ................................................................................ 3

    A.   Mintz's Employment with Priority Sports ............................... 3

    B.   Priority Sports and Bartelstein Retaliate Against Mintz ........... 6

    C.   The Claims and Counterclaims ............................................. 6

ARGUMENT ..................................................................................... 7

I.   MINTZ IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THE COMPLAINT ....................................................................... 7

    A.   Declaratory Judgment on the Noncompetition Provision ......... 7

    B.   The Computer Fraud and Abuse Act (18 U.S.C. § 1030) ......... 8

        1.   18 U.S.C. § 1030(a)(2)(C) .......................................... 8

        2.   18 U.S.C. § 1030(a)(4) ............................................... 8

    C.   The Electronic Communications and Privacy Act (18 U.S.C. §§ 2501 *et seq.*) ............................................................... 9

    D.   California Penal Code § 502 ................................................ 10

    E.   Invasion of Privacy .......................................................... 10

    F.   Unfair Competition (Cal. Bus. & Prof. Code §§ 17200 et seq.) ........... 11

II.   MINTZ AND CAA ARE ENTITLED TO SUMMARY JUDGMENT ON THE COUNTERCLAIMS ................................................... 12

    A.   Breach of Contract against Mintz ........................................ 12

        1.   Priority Sports Has No Evidence that Mintz Began to Work for CAA Prior to His Resignation ...................... 12

        2.   Priority Sports Has No Evidence that Mintz Solicited Players on CAA's Behalf Prior to His Resignation, or of Damage ............................................................. 13

        3.   Priority Sports Cannot Prove that Mintz Misappropriated or Disclosed Trade Secret or Confidential Information ...... 14

        4.   The Lack of 14 Days' Notice of Termination Did Not Result in Damage to Priority Sports ............................ 15

    B.   Breach of the Implied Covenant of Good Faith against Mintz ..... 15

C.   Breach of the Duty of Loyalty against Mintz .......................................... 16

D.   Misappropriation of Trade Secrets against Mintz and CAA ................ 16

E.   Intentional Interference with Contractual Relations against CAA ....... 21

F.   Intentional Interference with Present and Prospective Economic
     Advantage against Mintz and CAA ........................................................ 21

G.   Conversion against Mintz ....................................................................... 22

H.   Violation of California Penal Code § 502 against Mintz .................... 23

I.    Defamation and Trade Libel against Mintz ........................................... 23

J.    Conspiracy against Mintz and CAA ....................................................... 25

K.   Unfair Business Practices against Mintz and CAA ............................. 25

CONCLUSION ................................................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*City of Ontario v. Quan*
  __ U.S. __, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010) ...................................... 11

*eBay Inc. v. Digital Point Solutions, Inc.*
  608 F. Supp. 2d 1156 (N.D. Cal. 2009) ................................................................ 8

*Facebook, Inc. v. Power Ventures, Inc.*
  844 F. Supp. 2d 1025 (N.D. Cal. 2012) ................................................................ 9

*FormFactor, Inc. v. Micro-Probe, Inc.*
  No. C 10-3095, 2012 U.S. Dist. LEXIS 79359 (N.D. Cal. June 7, 2012) ......... 20

*Gardner v. Martino*
  563 F. 3d 981 (9th Cir. 2009) ............................................................................. 23

*In re iPhone Application Litig.*
  844 F. Supp. 2d 1040 (N.D. Cal. 2012) ................................................................ 9

*Morton v. Rank Am., Inc.*
  812 F. Supp. 1062 (C.D. Cal. 1993) .................................................................... 17

*Multiven Inc. v. Cisco Sys., Inc.*
  725 F. Supp. 2d 887 (N.D. Cal. 2010) ................................................................ 10

*O'Very v. Spectratek Techs., Inc.*
  No. CV 03-00540, 2004 U.S. Dist. LEXIS 31095
  (C.D. Cal. July 26, 2004) ............................................................................. 16, 19

*SOAProjects, Inc. v. SCM Microsystems, Inc.*
  No. 10-CV-01773, 2010 U.S. Dist. LEXIS 133596 (N.D. Cal. Dec. 7,
  2010) ..................................................................................................................... 14

*Steinberg Moorad & Dunn, Inc. v. Dunn*
  No. CV 01-07009, 2002 U.S. Dist. LEXIS 26752 (C.D. Cal. Dec. 26,
  2002) ..................................................................................................................... 17

*W. Shoe Gallery, Inc. v. Duty Free Shoppers, Ltd.*
  593 F. Supp. 348 (C.D. Cal. 1984) ..................................................................... 23

*Weco Supply Co. v. Sherwin-Williams Co.*
No. 10-CV-00171, 2012 U.S. Dist. LEXIS 73255 (E.D. Cal. May 25,
2012) ......................................................................................................... 20

**CALIFORNIA CASES**

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*
7 Cal. 4th 503 (1994) ................................................................................ 25

*Bionghi v. Metro. Water Dist. of S. Cal.*
70 Cal. App. 4th 1358 (1999) .................................................................. 15

*Cal. Francisco Inv. Corp v. Vrionis*
14 Cal. App. 3d 318 (1971) ............................................................... 16, 19

*Campanelli v. Regents of Univ. of Cal.*
44 Cal. App. 4th 572 (1996) .................................................................... 24

*ComputerXpress, Inc. v. Jackson*
93 Cal. App. 4th 993 (2001) .................................................................... 23

*Cont'l Car-Na-Var Corp. v. Moseley*
24 Cal. 2d 104 (1944) ............................................................................... 17

*Cytodyn, Inc. v. Amerimmune Pharms., Inc.*
160 Cal. App. 4th 288 (2008) .................................................................. 16

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*
11 Cal. 4th 376 (1995) .............................................................................. 21

*Dollinger DeAnza Assocs. v. Chicago Title Ins. Co.*
199 Cal. App. 4th 1132 (2011) .......................................................... 12, 13

*Edwards v. Arthur Andersen LLP*
44 Cal. 4th 937 (2008) ............................................................................ 1, 7

*Eisenberg v. Alameda Newspapers, Inc.*
74 Cal. App. 4th 1359 (1999) .................................................................. 23

*Hernandez v. Hillsides, Inc.*
47 Cal. 4th 272 (2009) .............................................................................. 11

1270/51504-001
current/32065794v1

*Hill v. NCAA*
   7 Cal. 4th 1 (1994)................................................................................10

*Holmes v. Petrovich Dev. Co., LLC*
   191 Cal. App. 4th 1047 (2011)............................................................11

*Int'l Fed'n of Prof'l & Tech. Eng'rs, Local 21, AFL-CIO*
   42 Cal. 4th 319 (2007)..........................................................................10

*Jensen v. Hewlett Packard Co.*
   14 Cal. App. 4th 958 (1993).................................................................23

*Kashani v. Tsann Kuen China Ent. Co., Ltd.*
   118 Cal. App. 4th 531 (2004)...............................................................15

*Lueter v. State of Cal.*
   94 Cal. App. 4th 1285 (2002)...............................................................22

*Mandicino v. Maggard*
   210 Cal. App. 3d 1413 (1989)..............................................................25

*Mehrtash v. Mehrtash*
   93 Cal. App. 4th 75 (2001)...................................................................25

*Nygard, Inc. v. Uusi-Kerttula*
   159 Cal. App. 4th 1027 (2008)........................................................16, 25

*Oasis W. Realty, LLC v. Goldman*
   51 Cal. 4th 811 (2011)..........................................................................12

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*
   150 Cal. App. 4th 384 (2007)...............................................................22

*Quelimane Co. v. Steward Title Guar. Co.*
   19 Cal. 4th 26 (1998)............................................................................21

*Reeves v. Hanlon*
   33 Cal. 4th 1140, 95 P. 3d 513 (2004) .................................................21

*Richards v. Sequoia Ins. Co.*
   195 Cal. App. 4th 431 (2011)...............................................................14

*Rigging Int'l Maintenance Co. v. Gwin*
   128 Cal. App. 3d 594 (1982)...........................................................17, 18

1270/51504-001
current/32065794v1

*SASCO v. Rosendin Elec., Inc.*
  207 Cal. App. 4th 837 (2012).............................................................. 18

*Silvaco Data Sys. V. Intel Corp.*
  184 Cal. App. 4th 210 (2010).............................................................. 14

*Summit Bank v. Rogers*
  206 Cal. App. 4th 669 (2012).............................................................. 23

*Walker v. Countrywide Home Loans, Inc.*
  98 Cal. App. 4th 1158 (2002)......................................................... 11, 25


**FEDERAL STATUTES**

18 U.S.C.
  § 1030 ...................................................................................... 7, 8
  § 1030(a)(2)(C)............................................................................. 8
  § 1030(a)(4) ............................................................................ 8, 9
  § 1030(g).................................................................................... 8

18 U.S.C.
  §§ 2501 *et seq.* ........................................................................ 7, 9

18 U.S.C.
  § 2510(4)..................................................................................... 9
  § 2511(1)(a)................................................................................. 9
  § 2511(1)(c)................................................................................. 9
  § 2511(1)(d)................................................................................. 9


**CALIFORNIA STATUES**

Cal. Bus. & Prof. Code
  § 16600 .................................................................................... 1, 7
  § 16601 ...................................................................................... 1
  § 16602 ...................................................................................... 1
  § 16602.5 .................................................................................... 1
  § 17200 *et seq.* ...................................................................... 7, 11

Cal. Civ. Code § 3426.1(b).................................................................. 16

1270/51504-001
current/32065794v1

1

Cal. Pen. Code

§ 502 ...................................................................................passim

2

§ 502(c)(1) ..................................................................... 10, 23

3

§ 502(c)(2) ..................................................................... 10, 23

§ 502(c)(3) ........................................................................... 23

4

§ 502(c)(6) ..................................................................... 10, 23

5

§ 502(c)(7) ..................................................................... 10, 23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1270/51504-001
current/32065794v1

**INTRODUCTION**

It is ironic that defendants and counterclaimants Mark Bartelstein & Associates, Inc., d/b/a Priority Sports & Entertainment ("Priority Sports"), and Mark Bartelstein ("Bartelstein"), who are in the highly competitive business of representing professional athletes, suffer from a deep-seated, paranoiac fear of competition from plaintiff and counterdefendant Aaron L. Mintz ("Mintz"), a far more junior professional basketball player agent.  After working for Priority Sports for 11 years, Mintz pursued a better opportunity with Priority Sports competitor, counterdefendant Creative Artists Agency, LLC ("CAA").  Provisions in Mintz's Priority Sports employment agreement, however, purported to:  (i) prevent him from soliciting his own clients for two years after his employment ended; (ii) prevent him from working for a Priority Sports competitor for two years after his employment ended; and (iii) require him to remain a Priority Sports employee for 14 days after he resigned.  These non-compete provisions are void under California law.  *See* Cal. Bus. & Prof. Code § 16600;[1] *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 945-46 (2008) (stating that California law "evinces a settled legislative policy in favor of open competition and employee mobility" and protects "the important legal right of persons to engage in businesses and occupations of their choosing").  Upon resigning from Priority Sports, Mintz filed the complaint for declaratory relief to protect his right as a California citizen to continue to work as a professional basketball player agent.

Priority Sports and Bartelstein became unhinged.  Two days after Mintz resigned, Priority Sports hacked into his personal e-mail account, reviewed the terms of his confidential employment contract with CAA, and disclosed those terms

---

[1] Section 16600 states:  "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."  The statutory exceptions are the sale of goodwill of a business, the dissolution of a partnership, and the dissolution of a limited liability company, none of which apply here.  *Id.* at §§ 16601, 16602, and 16602.5.

to various third parties.  Bartelstein made defamatory statements about Mintz to professional basketball team executives, players, and players' family members to persuade players not to follow Mintz to CAA.  Among other things, Bartelstein falsely stated that Mintz would not be able to work as a player agent for two years and could be "put in jail" for "what he did to Priority Sports."  Based on these unlawful activities, Mintz had no choice but to file additional claims against Priority Sports and Bartelstein.  Priority Sports responded by filing 12 mirror-image counterclaims against Mintz and CAA, with virtually all of the material allegations supported by nothing but "information and belief."

Mintz is entitled to partial summary judgment on all his claims other than defamation and interference with prospective economic advantage.  Mintz should prevail on his declaratory relief claim because the California Supreme Court has held that post-employment non-compete provisions are void, except in limited situations inapplicable here.[2]  Mintz should prevail on his other claims because Priority Sports admits that it instructed one of its employees to hack into Mintz's personal Gmail account, whereby it obtained the terms of his employment agreement with CAA.

Mintz and CAA are entitled to summary judgment or, alternatively, partial summary judgment on the counterclaims.  Priority Sports and Bartelstein have never had a legal or factual basis for any of them.  Testifying for Priority Sports and himself, Bartelstein admitted in his deposition that he has no evidence to support the counterclaims (except, perhaps, for defamation and trade libel, which are nonetheless not viable because the purported statements on which they are based are inadmissible hearsay and opinion).  Bartelstein repeatedly testified that the counterclaims are based on nothing more than his "tremendous suspicions" of wrongdoing by Mintz.

---

[2] Priority Sports' counsel had admitted this point of law, but has refused several requests to stipulate to it.  (Declaration of Robert H. Horn ("Horn Decl.") ¶ 13.)

# BACKGROUND

### A.   Mintz's Employment with Priority Sports

Priority Sports is a Chicago-based sports agency owned by Bartelstein.  It employs sports agents to engage in the business of recruiting and representing professional athletes.  (Mintz Decl. ¶ 5.)   Priority Sports employed Mintz in its Los Angeles office from September 25, 2001, when he was 26 years old, until his resignation on March 23, 2012.  (UF 1-3, 6.)  Mintz's starting salary was $30,000.  He worked hard to succeed as a National Basketball Association ("NBA") player agent in a notoriously cut-throat business.  He developed personal relationships with players and their family members, coaches, and trainers.  He often had young clients stay at his home.  This hard work paid off.  In the 2007 through 2011 NBA drafts, Mintz signed more top players than Bartelstein did.  When he left Priority Sports, he held the title of President of Athlete Representation.  (Mintz Decl. ¶¶ 5-7)

The collective bargaining agreement between the NBA and the players' union, the National Basketball Players Association ("NBPA"), mandates use of a form contract between an NBA player and a team.  (UF 42.)  The NBPA requires player agents to use a form contract titled Standard Player Agent Contract ("SPAC").  (UF 43.)  As the NBPA recognizes only individual agents, not agencies, Mintz and Bartelstein each signed the SPACs with the players at issue in this case.  Priority Sports is not a signatory on those contracts.  (UF 44-45.)

Mintz's situation at Priority Sports increasingly frustrated him.  Despite his and Mintz's joint representation of certain players, Bartelstein, the self-styled "Michael Jordan of basketball agents," insisted on taking public credit.  With the exception of one player, Bartelstein required Mintz to transfer his 50% share of commissions to Bartelstein for players that Mintz solely recruited and signed.  Bartelstein also brushed off Mintz's repeated concerns regarding deficiencies in Priority Sports' marketing department, which Mintz believed hampered his ability to obtain lucrative endorsement deals for his existing and future clients.  Mintz had

1   raised these concerns on several occasions following complaints made to him by

2   clients.  Bartelstein refused to address this situation.  Moreover, he made clear that

3   he would never allow Mintz more than limited credit and compensation regardless

4   of the players he signed or his role in recruiting them.  (Mintz Decl. ¶ 10-12.)  He

5   told Mintz in "colorful" language that if he didn't like it, he could go work

6   elsewhere.  (*Id*. at ¶ 11.)  As would any young, talented, and ambitious individual in

7   his shoes would, Mintz decided to seek employment with an agency offering greater

8   potential for professional growth.  He found this opportunity with the powerhouse

9   Los Angeles-based agency CAA, whose agents represent such NBA superstars as

10  Dwyane Wade, Chris Paul, and Carmelo Anthony.  (*Id*. ¶ 13.)

11          In early March 2012, CAA offered Mintz a job.  But Mintz first had to deal

12  with a legal issue.  His Priority Sports employment contract included two non-

13  compete provisions that might be enforceable in Illinois, but are clearly void in

14  California.  The first provision stated in relevant part:

15                  For two (2) years following the termination of the

16                  Employee's employment, regardless of the reason

17                  therefore, the Employee agrees that the Employee will not,

18                  directly or indirectly, on behalf of himself or others either

19                  as an employee, consultant, owner, independent contractor

20                  or in any other capacity whatsoever:

21                  1.      Solicit Company Clients;

22                  …

23                  4.      Provide, or assist in providing, either directly or

24                          through a Company Competitor, services that are, or

25                          are similar to the services, provided by the

26                          Company to a Company Client.

27  (UF 4.)  The second provision stated that while Priority Sports "may elect in its sole

28  discretion to terminate [Mintz's] employment with the Company effective

4

immediately," Mintz "may terminate his employment with the Company for any reason or no reason upon fourteen (14) days' written notice to the Company."  (UF 5.)  This provision was intended to prevent Mintz from competing against Priority Sports for clients, *including Mintz's own clients*, immediately after he resigned from Priority Sports – thus giving Priority Sports and Bartelstein the unfettered ability to solicit the clients while putting Mintz "on ice" for two weeks.  This anticompetitive aspect of the 14-day notice provision is void under California law.

Mintz initially planned to resign on March 19, 2012, and reserved a flight to Chicago to inform Bartelstein in person.  (Mintz Decl. ¶ 14.)  Priority Sports subsequently asked him to attend a meeting in Los Angeles on March 23rd.  Mintz postponed his resignation because he knew the meeting was important to Kenneth Zuckerman ("Zuckerman"), a co-worker with whom he had worked closely for 11 years.  Mintz changed his flight reservation to Monday, March 26th.  (*Id*.)

On Friday morning, March 23, 2012, Bartelstein telephoned Mintz about a "rumor" he had heard that Mintz was leaving Priority Sports.  Mintz (who was in a meeting at the time) said he was unable to discuss the matter but would call Bartelstein back.  Mintz and Bartelstein spoke again that evening.  Mintz told Bartelstein that it was extremely difficult for him to make the call, and he had planned to go to Chicago to inform Bartelstein in person.  He then told Bartelstein that he had decided to resign from Priority Sports and take a position with CAA.  Bartelstein did not take this news well.  He said in a nasty tone, "Oh, that's great, that's great.  I knew it."  Mintz said, "I wish you wouldn't react that way, we had 11 great years together."  Bartelstein shouted, "You were a nothing.  You were a nothing.  You f—king begged for a job, and I f—king made you."  Mintz replied, "I wish you didn't feel that way.  I put everything I had into this company."  Mintz further stated that he was not looking for anything from Priority Sports or Bartelstein, but had to file a declaratory relief lawsuit to protect his right as a

1270/51504-001
current/32065794v1

California citizen to continue to work.  Bartelstein said, "Wait until I tell the world about this.  You made your bed, you better be ready to lie in it." (*Id.* ¶ 15.)

Notwithstanding his resignation, Mintz remains the NBPA-recognized agent for players Paul George ("George"), Dominic McGuire ("McGuire"), Bobby Brown, Malcolm Thomas, Danny Granger ("Granger"), Reggie Jackson, Jeff Adrien, Jordan Crawford, Joe Crawford, J.R. Giddens, Mike Taylor, and Acie Law.  (UF 49.)

## B.    Priority Sports and Bartelstein Retaliate Against Mintz

Priority Sports' and Bartelstein's retaliation began almost immediately.  On March 25, 2012, two days after Mintz resigned, Priority Sports' General Counsel, Rick Smith, instructed Priority Sports' Director of Basketball Operations, Bradley Ames ("Ames"), to access Mintz's password-protected personal e-mail account (the "Gmail account") without Mintz's authorization – a crime in California.  (UF 7-10.) *See* Cal. Penal Code § 502.  Ames obtained a temporary password and accessed Mintz's personal Gmail account for approximately two hours.  (UF 11.)  Ames "viewed or emailed" a copy of Mintz's employment agreement with CAA.  (UF 12.) The next day, Zuckerman sent an e-mail to Mintz feigning ignorance of the computer hacking and theft of Mintz's personal employment information:  "I'm in shock!  *Rumor on the street* is that CAA is paying you less money over 4 years then [sic] you would have made here.  I don't get it[.]  *You had a 50-year guaranteed deal here*."  (Emphasis added.)  (UF 15.)  There was no rumor on the street, of course.  Priority Sports had obtained this information illegally by hacking into Mintz's personal Gmail account.  It then disclosed the compensation terms of Mintz's CAA employment contract to at least one third party.  (UF 16.)  Bartelstein proceeded to defame Mintz to various NBA team executives and players (and the players' family members) so as to persuade them not to follow Mintz to CAA.

## C.    The Claims and Counterclaims

Mintz initiated this action by filing a complaint for declaratory relief.  Based on Priority Sports' and Bartelstein's post-complaint conduct, Mintz filed additional

1    claims for:  (1) violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030);

2    (2) violation of the Electronic Communications and Privacy Act (18 U.S. C. §§ 2501

3    *et seq*.); (3) violation of the California Computer Data Access and Fraud Act (Cal.

4    Pen. Code § 502); (4) defamation; (5) invasion of privacy; (6) interference with

5    prospective economic advantage; and (7) unfair business actions and practices (Cal.

6    Bus. & Prof. Code § 17200 *et seq*.).[3]  Mintz seeks partial summary judgment on all

7    claims, except for defamation and interference with economic advantage.

8         Priority Sports and Bartelstein responded in kind with the following

9    counterclaims:  (1) breach of contract; (2) breach of the covenant of good faith and

10   fair dealing; (3) breach of the duty of loyalty; (4) misappropriation of trade secrets;

11   (5) intentional interference with contractual relations; (6) intentional interference

12   with present and prospective economic advantage and business relationships;

13   (7) conversion; (8) violation of California Penal Code § 502; (9) defamation;

14   (10) trade libel; (11) conspiracy; and (12)  unfair business acts and practices.  Mintz

15   seeks summary judgment or, alternatively, partial summary judgment on all

16   counterclaims but the fifth (alleged against CAA only).  CAA seeks summary

17   judgment or, alternatively, partial summary judgment, on the counterclaims to

18   which it is a party, namely the fourth, fifth, sixth, eleventh and twelfth.

19                              **ARGUMENT**

20   I.    **MINTZ IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON**

21         **THE COMPLAINT**

22         A.    **Declaratory Judgment on the Noncompetition Provision**

23         It is incontestable that the two-year non-compete provision is void.  *See* Cal.

24   Bus. & Prof. Code § 16600; *Edwards*, 44 Cal. 4th at 947-49.  The Court should also

25   find that 14 days' notice of termination provision is in fact a void non-compete

---

[3] Mintz filed the additional claims in a separate action.  The counterclaims in both cases are identical, except that Bartelstein is a counterclaimant only in No. 12-3055. On June 11, 2012, the Court consolidated the initial case, No. 12-2554, with the second case, No. 12-3055.

1   provision.  The only difference between the two-year and the 14-day provisions is

2   the duration.  The purpose of both provisions is identical – to prevent Mintz from

3   competing against Priority Sports.

4       **B.**    <u>**The Computer Fraud and Abuse Act (18 U.S.C. § 1030)**</u>

5           **1.**    <u>**18 U.S.C. § 1030(a)(2)(C)**</u>

6          By hacking into Mintz's personal Gmail account, Priority Sports violated

7   various computer protection statutes, including the Computer Fraud and Abuse Act

8   ("CFAA").  Section 1030(a)(2)(C) of the CFAA imposes civil liability on whoever

9   "intentionally accesses a computer without authorization or exceeds authorized

10  access, and thereby obtains … information from any protected computer."  The

11  evidence establishes each element of this claim.  Priority Sports intentionally

12  accessed Mintz's personal Gmail account through the www.gmail.com website.[4]

13  (UF 7-13, 15.)  It did so without Mintz's authorization and obtained private

14  information regarding the terms of his employment with CAA.  (UF 9-13.)  Pursuant

15  to section 1030(g), Mintz is entitled to damages as set forth below.

16          **2.**    <u>**18 U.S.C. § 1030(a)(4)**</u>

17         Section 1030(a)(4) of the CFAA imposes civil liability on whoever

18  "knowingly and with intent to defraud, accesses a protected computer without

19  authorization or exceeds authorized access, and by such conduct furthers the

20  intended fraud and obtains anything of value."  Fraud under the CFAA "only

21  requires a showing of unlawful access; there is no need to prove the elements of

22  common law fraud."  *eBay*, 608 F. Supp. 2d at 1164.  A plaintiff also must prove

23  damages of at least $5,000.  18 U.S.C. § 1030(a)(4).  "Costs associated with

24

25  ――――――――――――――
    [4] *See eBay Inc. v. Digital Point Solutions, Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D.
    Cal. 2009) (stating that a website may qualify as a "protected computer" under the
26  CFAA).  Ames testified he went onto the Gmail website, misrepresented that the
    account holder (Mintz) had forgotten his password, and asked Gmail to send a new
27  password to Mintz's designated "safety" e-mail address, which was his Priority
    Sports e-mail address.  Ames used the temporary password to access Mintz's Gmail
28  account.  (UF 11.)

investigating intrusions into a computer network and taking subsequent remedial measures are losses within the meaning of the [CFAA]").  *Facebook, Inc. v. Power Ventures, Inc.*, 844 F. Supp. 2d 1025, 1039 (N.D. Cal. 2012).

It is undisputed that Priority Sports knowingly, intentionally, and without authorization changed the password and accessed Mintz's personal Gmail account. (UF 7-13, 15.)  Priority Sports obtained something of value:  the terms of Mintz's employment contract with CAA, which Priority Sports disclosed to at least one third party in an effort to discredit Mintz's professional standing.  (UF 16.)  CAA does not make the terms of its agents' employment agreements public.  (UF 13.)  Mintz incurred $25,796.25 in costs and attorneys' fees to identify Priority Sports as the hacker.  (UF 14.)  Mintz is entitled to judgment on his section 1030(a)(4) claim.

## C.    The Electronic Communications and Privacy Act (18 U.S.C. §§ 2501 *et seq.*)

The Electronic Communications and Privacy Act ("ECPA") provides a private right of action against any person who intercepts[5] any electronic communication, or discloses or uses the contents of any electronic communication knowing such information was obtained through such illegal interception.  *See* 18 U.S.C. §§ 2511(1)(a),(c),(d); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1061 (N.D. Cal. 2012) (ECPA provides private right of action).  Priority Sports violated both aspects of the ECPA.  First, it intentionally intercepted Mintz's electronic communications by hacking into his personal Gmail account.  (UF 7-13, 15.)  Second, it disclosed the contents of the communications – the terms of Mintz's employment with CAA – to at least one third party.  (UF 16.)  Mintz's damages are the attorneys' fees and costs incurred identifying Priority Sports as the hacker.  (UF 14.)  *See Facebook, Inc.*, 844 F. Supp. 2d at 1039.

---

[5] The ECPA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

1

**D.     California Penal Code § 502**

2          California Penal Code § 502 imposes liability on whoever knowingly

3    accesses, and without permission:  (i) uses any data to defraud another person;

4    (ii) wrongfully obtains data; (iii) takes, copies, or makes use of wrongfully obtained

5    data; and (iv) unlawfully accesses or assists in accessing of any computer.  Cal. Pen.

6    Code §§ 502(c)(1),(2),(6),(7).  The elements of a Section 502 claim "do not differ

7    materially" from the elements of a CFAA claim.  *Multiven Inc. v. Cisco Sys., Inc.*,

8    725 F. Supp. 2d 887, 895 (N.D. Cal. 2010) (granting summary judgment where

9    Section 502 and CFAA claims were based on identical facts).  Thus, the undisputed

10   facts entitling Mintz to judgment on his CFAA claim likewise entitle him to

11   judgment on his section 502 claim.

12

**E.     Invasion of Privacy**

13         A claim for invasion of the state constitutional right of privacy encompasses

14   three elements, discussed in turn.  *Hill v. NCAA*, 7 Cal. 4th 1, 35, 39-40 (1994).

15   First, the plaintiff must establish a legally protected privacy interest.  *Id*. at 35.  This

16   is a question of law.  *Id*. at 40.  Second, the plaintiff must establish a reasonable

17   expectation of privacy under the circumstances.  *Id*. at 36.  This is a mixed question

18   of fact and law.  *Id*. at 40.  Factors under this element include advance notice of

19   impending action, customs, societal norms, and the presence or absence of

20   opportunities for voluntary consent.  *Id*. at 36-37.  Third, the plaintiff must

21   demonstrate that the defendant's conduct was "sufficiently serious in its nature,

22   scope, and actual or potential impact" to constitute an invasion of privacy.  *Id*. at 37.

23   This is a mixed question of law and fact.  *Id*. at 40.

24         The undisputed evidence establishes each element.  Mintz has a legally

25   protected privacy interest in precluding unauthorized access into his personal Gmail

26   account and the dissemination or misuse of information stored there, in particular

27   his CAA employment agreement.  *See* Cal. Penal Code § 502; *Int'l Fed'n of Prof'l

28   & Tech. Eng'rs, Local 21, AFL-CIO*, 42 Cal. 4th 319, 330 (2007) (recognizing

privacy interest in personal financial information).  Mintz had a reasonable expectation of privacy under the circumstances.  *See Holmes v. Petrovich Dev. Co., LLC*, 191 Cal. App. 4th 1047, 1068 (2011) (distinguishing use of company computer for personal e-mail from use of company computer to access Web-based personal e-mail) (citing *Stengart v. Loving Care Agency, Inc.*, 990 A.2d 650, 659, 663-64 (N.J. Sup. Ct. 2010) (stating that employee had expectation of privacy when using her company laptop to access a personal, password-protected e-mail account on Yahoo's website, and never saved her password on the laptop)).  Priority Sports' hacking into Mintz's personal Gmail account was a serious invasion of privacy:  it is a crime under California law.  *See* Cal. Penal Code § 502; *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009) (invasion of privacy occurs where one "obtain[s] unwanted access to data by electronic or other covert means, in violation of the law or social norms"); *City of Ontario v. Quan*, __ U.S. __, 130 S. Ct. 2619, 2631, 177 L. Ed. 2d 216 (2010) (stating that employer's audit of employee's messages on the employer-provided page was "not nearly as intrusive" as a search of his personal e-mail account or page).  Priority Sports exacerbated the invasion of privacy by disclosing the terms of Mintz's employment with CAA to at least one third party.  (UF 16.)  This highly offensive conduct caused Mintz to suffer mental anguish and other damage.[6]  (UF 18.)

### F.     Unfair Competition (Cal. Bus. & Prof. Code §§ 17200 et seq.)

California's Unfair Competition Laws ("UCL") proscribe any business act or practice forbidden by another law.  *Walker v. Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1169 (2002) ("The [UCL] thus creates an independent cause of action when a business practice violates some other law").  Mintz is entitled to judgment on this claim based on Priority Sports' predicate violations of the CFAA, ECPA, and California Penal Code § 502.

---

[6] The jury should determine the amount of damages for invasion of privacy.

1270/51504-001
current/32065794v1

## II.   MINTZ AND CAA ARE ENTITLED TO SUMMARY JUDGMENT ON THE COUNTERCLAIMS

### A.   Breach of Contract against Mintz

A claim for breach of contract requires proof of:  "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

Priority Sports alleges that Mintz breached his employment contract in four ways:  (i) Mintz worked for CAA prior to his resignation; (ii) Mintz solicited players on CAA's behalf prior to his resignation; (iii) Mintz misappropriated Priority Sports' trade secret and confidential information, and disclosed them to CAA; and (iv) Mintz neglected to provide 14 days' notice of termination.[7]  (Counterclaims ¶ 68.)  Mintz is entitled to judgment because Priority Sports' "evidence" is speculation and opinion.  *See Dollinger DeAnza Assocs. v. Chicago Title Ins. Co.*, 199 Cal. App. 4th 1132, 1145 (2011) ("[A] party cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact").

### 1.   Priority Sports Has No Evidence that Mintz Began to Work for CAA Prior to His Resignation

Mintz did not work for CAA prior to his resignation from Priority Sports. (UF 12.)  When asked for all facts proving this alleged breach, Bartelstein testified that Mintz sent a text message to Priority Sports employee Reggie Brown ("Brown") stating, "I hear you got great seats at [a] game," while a member of CAA was supposedly sitting "a couple of rows behind" Brown.  (UF 19.)

> **Q**:  And that proves somehow that he [Mintz] was
>
> working for CAA prior to March 23rd?

---

[7] Mintz's employment contract was with Priority Sports, not Bartelstein.  Thus, Bartelstein lacks standing to sue on all counterclaims except for defamation.

1270/51504-001
current/32065794v1

1    **A**: Not by itself.

2    **Q**: It was an inference that you made from that?

3    **A**: Um-hum [sic]."

4    (*Id*.)  Bartelstein further testified that telephone records reflect calls between Mintz

5    and CAA, but that he does not know what was discussed.[8]  (*Id*.)  Bartelstein also

6    testified he has seen "one or two" e-mails where Mintz allegedly sought permission

7    from his legal counsel to travel somewhere on an unspecified date.  (*Id*.)  This

8    evidence is insufficient to raise a triable issue of material fact.

9          **2.**    **Priority Sports Has No Evidence that Mintz Solicited Players**

10             **on CAA's Behalf Prior to His Resignation, or of Damage**

11         The "evidence" of pre-resignation solicitation fails to raise a triable issue of

12   material fact.  When asked for all facts establishing that Mintz solicited players prior

13   to his resignation, Bartelstein testified he believes that Mintz did not disclose a

14   telephone call with the mother of an NBA player.  (UF 20.)  Regardless of whether

15   this call occurred (Bartelstein conceded he does not know), Bartelstein admitted he

16   has no facts to establish that Mintz solicited the player during the purported call:

17          **Q**:  Okay.  So again, it's inference on your part that he

18          [Mintz] was actually recruiting on behalf of CAA, and not

19          Priority Sports, prior to March 23, 2012, right?

20          **A**:  Correct.

21   (*Id*.)  Bartelstein also cited his belief that Mintz was not giving Priority Sports his

22   "best effort," which he concluded meant that Mintz "*may have* also been, in fact,

23   recruiting those players for CAA."  (*Id*. (emphasis added).)  (*Id*.)  Further, no player

24   has ever told Priority Sports that Mintz solicited him prior to Mintz's resignation

25   from Priority Sports.  (UF 21.)  Bartelstein's thoughts and conjecture do not create a

26   triable issue of fact regarding solicitation.  *See Dollinger*, 199 Cal. App. 4th at 1145.

27   _____
[8] In fact, Mintz often called his friends at CAA to discuss personal matters unrelated

28   to potential employment.  (Mintz Decl. ¶ 13.)

1    Lastly, Priority Sports relies on ambiguous testimony of Floyd Johnson

2  ("Johnson"), an associate of NBA player Taj Gibson ("Gibson") to whom

3  Bartelstein pays a percentage of his commissions.  (UF 22.)  Johnson testified that

4  Mintz called him and said he "might be making a move soon to a new company,

5  which was CAA," and that it "would be a good place" for Johnson and Gibson.

6  (*Id.*)  Johnson's testimony establishes nothing.  He does not have personal

7  knowledge of when Mintz resigned, and testified he was not sure of the date of the

8  call.  (*Id.*)  Even assuming this conversation occurred before Mintz resigned,

9  Priority Sports cannot establish a breach of contract claim.  As Gibson did not leave

10  Priority Sports to follow Mintz to CAA (UF 23), Priority Sports cannot prove

11  damages resulting from the purported pre-resignation solicitation.  *See Richards v.*

12  *Sequoia Ins. Co.*, 195 Cal. App. 4th 431, 434 (2011) (affirming grant of summary

13  judgment "on the basis that the [plaintiffs] sustained no damages as result of

14  [defendant's] alleged breach").

15          **3.      Priority Sports Cannot Prove that Mintz Misappropriated or**

16                **Disclosed Trade Secret or Confidential Information**

17          The California Uniform Trade Secrets Act ("CUTSA") preempts Priority

18  Sports' breach of contract counterclaim to the extent it is based on alleged trade

19  secret misappropriation.[9]  *See SOAProjects, Inc. v. SCM Microsystems, Inc.*, No. 10-

20  CV-01773, 2010 U.S. Dist. LEXIS 133596, *27 (N.D. Cal. Dec. 7, 2010)

21  (dismissing unjust enrichment claim based on alleged trade secret misappropriation

22  based on preemption by CUTSA) (citing *Silvaco Data Sys. V. Intel Corp.*, 184 Cal.

23  App. 4th 210, 236 (2010)) ("We thus reaffirm that CUTSA provides the exclusive

24  civil remedy for conduct falling within its terms, so as to supersede other civil

25  remedies based upon misappropriation of trade secret").  Regardless, Priority Sports

26  cannot establish a CUTSA violation for the reasons set forth in Section II(D) below.

27  ────────────────

28  [9] CUTSA preempts the counterclaims for breach of the implied covenant and fair
dealing, breach of the duty of loyalty, and unfair competition to the same extent.

**4.** **The Lack of 14 Days' Notice of Termination Did Not Result in Damage to Priority Sports**

Mintz did not provide 14 days' notice of his resignation.  (UF 6.)  A 14-day non-compete provision under the guise of extending Mintz's employment after he resigned, however, is legally indistinguishable from the void two-year non-compete. Priority Sports therefore cannot recover damages based on any solicitation by Mintz during that two-week period.  *See*, *e.g.*, *Kashani v. Tsann Kuen China Ent. Co., Ltd.*, 118 Cal. App. 4th 531, 558 (2004) ("[A]llowing plaintiffs damages for a breach of an illegal contract would be inconsistent with the rationale for the doctrine of unenforceability of illegal contracts").  Bartelstein testified that Priority Sports was damaged because he had to divert his attention from recruiting potential clients in order to call existing clients (jointly represented by Mintz) during the 14-day period in an effort to retain them as clients.  (UF 24.)  This argument is untenable because Bartelstein obviously would have made the calls even if Mintz had provided 14 days' notice.  That provision was plainly designed to allow Bartelstein to importune clients without competition from Mintz.  Further, Priority Sports could not have incurred any damage because the players were not its clients.  As explained above, the NBPA does not recognize agencies as player representatives.  (UF 45.)

**B.** **Breach of the Implied Covenant of Good Faith against Mintz**

A claim for breach of the implied covenant of good faith and fair dealing based on identical allegations as a breach of contract claim is superfluous.  *Bionghi v. Metro. Water Dist. of S. Cal.*, 70 Cal. App. 4th 1358, 1370 (1999) (where implied covenant claim "do[es] not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek[s] the same damages or other relief already claimed in a companion contract cause of action," such claim "may be disregarded as superfluous as no additional claim is actually stated").  Because Priority Sports' implied covenant claim is based on the same breaches purportedly supporting its breach of contract claim, and such claim fails as a matter of law,

1  Mintz is entitled to summary judgment on the implied covenant claim.

2  (Counterclaims ¶ 74.)

3      **C.    Breach of the Duty of Loyalty against Mintz**

4      Priority Sports bases its breach of loyalty claim on the same conduct

5  regarding its breach of contract and breach of the implied covenant claims.

6  (Counterclaims ¶ 78.)  Accordingly, that claim fails for the same reasons described

7  in Section II(A) above.  *See Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027,

8  1046 (2008) (employer's breach of loyalty claim "necessarily" failed where

9  employee did not breach underlying contractual duties).  Moreover, when asked for

10 facts supporting this claim, Bartelstein testified he has none (UF 27):

11          **A**:  Well, I don't have any facts, but the fact that [certain

12          players did not to speak with me after March 23rd] gives

13          me suspicion.

14      **Q**:  Okay.  Again, suspicion, but no facts, right?

15      **A**:  Correct.

16      **D.    Misappropriation of Trade Secrets against Mintz and CAA**

17      A misappropriation of trade secrets claim requires proof that:  "(1) the

18 plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the

19 plaintiff's trade secret through improper means, and (3) the defendant's actions

20 damaged the plaintiff."  *Cytodyn, Inc. v. Amerimmune Pharms., Inc*., 160 Cal. App.

21 4th 288, 297 (2008); Cal. Civ. Code § 3426.1(b).  "A trade secret may consist of any

22 formula, pattern, device or compilation of information which is used in one's

23 business, and which gives him an opportunity to obtain an advantage over

24 competitors who do not know or use it."  *O'Very v. Spectratek Techs., Inc.*, No. CV

25 03-00540, 2004 U.S. Dist. LEXIS 31095, *18-19 (C.D. Cal. July 26, 2004) (quoting

26 *Cal. Francisco Inv. Corp v. Vrionis*, 14 Cal. App. 3d 318, 321-22 (1971)).  "An

27 employee's skill and knowledge of a particular business constitute the means by

28 which he earns a living, and the courts should not hastily brand them as confidential

1  where this will deprive him of employment opportunities." *Rigging Int'l*

2  *Maintenance Co. v. Gwin*, 128 Cal. App. 3d 594, 606-07 (1982).  "A trade secret

3  may only exist … if reasonable steps were taken to maintain its secrecy."  *Morton v.*

4  *Rank Am., Inc.*, 812 F. Supp. 1062, 1075 (C.D. Cal. 1993).

5        Priority Sports' and Bartelstein's interrogatory responses identified the

6  following purported trade secret information (UF 29):

7              [C]lient names, addresses, emails, cell phone numbers and

8              birthdays; names and contact information of client family

9              members and other key decisions makers; domestic and

10             international client agreements or contracts (including

11             confidential terms and conditions thereof); recruiting plans

12             and strategies, career options and strategies, special

13             requirements, interests and preferences of clients;

14             domestic and international consultants and preferred

15             service providers (such as sports doctors) in domestic and

16             international locations.  Other types of confidential

17             information include, but are not limited to, business plans

18             and strategies.

19       None of this information qualifies as a trade secret.  Bartelstein testified that

20  player names, addresses, e-mail addresses, phone numbers, birthdates, and family

21  members' contact information are known to the public (player names and birthdates)

22  or generally known or available to professional basketball player agents and other

23  industry participants such as players, coaches, and teams.  (UF 30.)  This negates the

24  asserted trade secret protection.  *See Steinberg Moorad & Dunn, Inc. v. Dunn*, No.

25  CV 01-07009, 2002 U.S. Dist. LEXIS 26752, *62 (C.D. Cal. Dec. 26, 2002) (no

26  protection for information "generally known to either the public or to persons in the

27  sports representation industry"); *Cont'l Car-Na-Var Corp. v. Moseley*, 24 Cal. 2d

28  104, 108-09 (1944) (no trade protection where "[t]he evidence was

undisputed that the names and addresses of persons, [and] firms … using the type of products sold by plaintiff [were] commonly known to the trade").  Player contracts with teams and agents are filed with the NBPA and are available to any player agent.  (UF 31.)  Recruiting and career options and strategies, player interests and preferences, and providers of services to players are generally known or available to player agents and other industry participants such as players, coaches, and teams.  (UF 32.)  A professional basketball agent's activities are not rocket science:  the goal is to recruit and sign the best amateur prospects, solicit and sign professional players, and negotiate the best possible team and marketing contracts.  Priority Sports cannot prevent Mintz from using his knowledge of the basketball sports business.  *See Rigging Int'l*, 128 Cal. App. 3d at 606-07.

It is undisputed that Mintz did not remove any electronic data or documents when he left Priority Sports.  (UF 33.)  CAA expressly conditioned Mintz's employment on compliance with certain "ground rules" requiring him not to remove, retain, or disclose any of Priority Sports' confidential or proprietary information.  (UF 34.)  Bartelstein testified that the misappropriation claim is based only on his "suspicion" that Mintz must have taken or disclosed trade secret or confidential information.  (UF 35.)  Suspicion does not create a triable issue of material fact.  *See SASCO v. Rosendin Elec., Inc.*, 207 Cal. App. 4th 837, 848-49 (2012) (stating that speculation that employees "must have" taken trade secrets based on their decisions to change employers does not constitute evidence of misappropriation).

Priority Sports' only evidence of a disclosure of information by Mintz to CAA relates to commissions.  The SPAC limits an agent's commission to 4% of a player's compensation.[10]  If not for the purpose of inducing a player to sign with an

---

[10] The 4% cap applies to players receiving more than the minimum compensation under the collective bargaining agreement between the NBA.  For players receiving the minimum compensation under the collective bargaining agreement, an agent's commission may not exceed 2%.

agent, agents may enter into a "side letter" to pay a percentage of his commission with a person or persons who are sometimes referred to as a player's "handler" (*e.g.*, "key decisions-makers" such as the player's family member, friend, trainer, etc.). (Mintz Decl. ¶ 34.)  If, for instance, a player's compensation is $100,000, his agent would receive up to a 4% or $4,000, and might pay 20% of that amount ($800) to the handler in exchange for certain services, such as making sure the player attends practice or shows up to scheduled marketing events.  The evidence shows that Mintz and CAA had a discussion regarding the commissions CAA could expect to receive if Mintz's clients followed him to CAA.  Mintz disclosed the specific net percentage commission received (*i.e.*, after the payment to a handler) from one player jointly represented by him and Bartelstein.  (UF 37.)  Mintz did not disclose specific percentages with respect to his other clients.  As to those players, CAA merely concluded that if they were to come over with Mintz "the fees would be what they were."  (UF 38.)  There is no evidence that Mintz or CAA used any of this information to solicit any player.

Commission splits with third party handlers are not trade secret or confidential information.  Trade secrets differ from other confidential business information in that they are not simply information relating to a "single or ephemeral event" in the conduct of the business.  *See Cal. Francisco*, 14 Cal. App. 3d at 322 (stating that the salary of certain employees is not a trade secret) (citing Rest. (Second), Torts § 757).  In other words, compensation paid to a third party is not a "formula, pattern, device or compilation of information."  *See O'Very*, 2004 U.S. Dist. LEXIS 31095, at *18-19.

Significantly, Priority Sports did not previously identify side letters as a trade secret or confidential information.  Priority Sports' own definition of trade secret or confidential information in Mintz's employment contract expressly included the terms of player contracts, but not the terms of side letters with handlers such as

1   client family members and other key decisions-makers.[11]  (UF 28.)  And, as noted

2   above, Priority Sports' and Bartelstein's interrogatory responses did the same.

3   (UF 29.)

4         Moreover, Priority Sports took no steps to ensure secrecy of the commission

5   splits.  The side letters used by Priority Sports do not have a confidentiality

6   provision.  (UF 40.)  Nothing prevents a handler from disclosing the commission

7   split to any person – including to agents at CAA.  *See Weco Supply Co. v. Sherwin-*

8   *Williams Co.*, No. 10-CV-00171, 2012 U.S. Dist. LEXIS 73255, at *23-24 (E.D.

9   Cal. May 25, 2012) (granting summary judgment for defendant on trade secret claim

10  where recipient of information had no obligation to preserve confidentiality of that

11  information).  For example, Jason Chambers ("Chambers"), the brother-in-law of

12  NBA player George, received a copy and knew the contents of a side letter between

13  Priority Sports and handler Sedric Toney.  (UF 39, 41.)  Priority Sports would have

14  no legal basis to enjoin Chambers from disclosing the commission split to any

15  person.  In sharp contrast, Priority Sports took great care to include confidentiality

16  provisions in Mintz's employment contract.  (UF 36.)

17        As Priority Sports cannot identify any trade secret or misappropriation, it

18  cannot establish damages.  *See FormFactor, Inc. v. Micro-Probe, Inc.*, No. C 10-

19  3095, 2012 U.S. Dist. LEXIS 79359, *37 (N.D. Cal. June 7, 2012) ("having failed to

20  adequately identify any trade secrets or to demonstrate misappropriation, no causal

21  link to any alleged harm can be drawn").  For the same reasons, Priority Sports

22  cannot establish that the any of the above-described information was confidential (as

23  distinguished from a trade secret).

24

25  [11] The employment contract defines "Confidential Business Information" as "trade
    secrets and other confidential or proprietary information that the Company has
26  developed or maintained or may develop or main, including, without limitation,
    client names and addresses, client agreements or contracts (including the terms and
27  conditions there of), special requirements of clients, Company financial reports, and
    Company business plans and strategies, and which the Company has made or may
28  make reasonable efforts to maintain the secrecy thereof."

**E.   Intentional Interference with Contractual Relations against CAA**

Intentional interference with contractual relations requires proof of:  (1) the existence of a valid contract with a third party; (2) the defendant's knowledge of the contract; (3) an intentional act by the defendant designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) damage resulting to the plaintiff.  *Quelimane Co. v. Steward Title Guar. Co*., 19 Cal. 4th 26, 56 (1998).

Priority Sports contends that CAA interfered with its employment contract with Mintz.  Mintz was an at-will employee.  (UF 50.)  As demonstrated above, CAA did nothing more than offer him a job.  CAA is entitled to judgment under this claim.  *See Reeves v. Hanlon*, 33 Cal. 4th 1140, 1153, 95 P. 3d 513 (2004) (no intentional interference liability where the "interference consists merely of extending a job offer that induces an employee to terminate his or her at-will employment").

**F.   Intentional Interference with Present and Prospective Economic Advantage against Mintz and CAA**

The elements of a claim for intentional interference with prospective economic advantage mirror those for interference with contractual relations, save for the additional requirement that the plaintiff establish that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). Priority Sports alleges that Mintz and CAA interfered with Barltelstein's relationships with players by:  (i) having Mintz work for CAA while still employed with Priority Sports; (ii) soliciting Mintz's and Bartelstein's jointly represented players on behalf of CAA; (iii) misappropriating Priority Sports' purported trade secret and confidential information; (iv) failing to give 14 days' notice of termination; and (vi) giving "bad information" to players and others about Priority Sports and Bartelstein to prevent him from contacting clients.  (Counterclaims

1     ¶ 101.)[12]  This claim fails for the same reasons discussed above relating to Priority

2     Sports' breach of contract and misappropriation claims.  Further, Bartelstein

3     testified that he has no evidence that Mintz told any player not to contact Bartelstein

4     or Priority Sports. (UF 53.)

5          **G.     Conversion against Mintz**

6          Conversion requires:  (1) one party's ownership or right to possession of the

7     property at the time of the alleged conversion; (2) another party's conversion by a

8     wrongful act or disposition of property rights; and (3) damages.  *PCO, Inc. v.*

9     *Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th

10    384, 395 (2007).  Priority Sports alleges that Mintz converted a laptop computer, a

11    Blackberry, and three boxes of documents.  (Counterclaims ¶¶ 105-106.)

12         The facts establish that Mintz delivered the laptop and Blackberry to his

13    attorneys promptly after resigning from Priority Sports.  (UF 54.)  The attorneys

14    delivered the laptop and three boxes of documents (consisting mostly of player

15    marketing materials, which Mintz did not review or use after he resigned) to Priority

16    Sports' counsel as soon as arrangements were made.  (UF 56.)  Mintz did not copy,

17    transfer, alter, delete, or damage any data on the laptop or the Blackberry.  (UF 55.)

18    A dispute exists over the ownership of the Blackberry, but Mintz produced the

19    telephone numbers and text messages on that device in discovery.  (UF 57.)

20         The facts also establish the absence of damages.  Bartelstein testified he is

21    unaware of any damage incurred between the date Mintz resigned and the date

22    Mintz's attorneys returned these items.  (UF 58.)  *See Lueter v. State of Cal.*, 94 Cal.

23    App. 4th 1285, 1302 (2002) (stating that the recovery of damages is subject to the

24    "fundamental rule that damages which are speculative, remote, imaginary,

25    contingent, or merely possible cannot serve as a legal basis for recovery").

26

27    [12] Priority Sports also alleges that CAA interfered with its "relationship" with Mintz.
      (Counterclaims ¶ 101.)  This allegation is duplicative of the intentional interference
28    with contract claim, and fails for the reasons set forth in section II(E) above.

**H.   Violation of California Penal Code § 502 against Mintz**

Priority Sports contends that Mintz accessed Priority Sports' computers in violation of its policies, and took and deleted data in violation of California Penal Code §§ 502(c)(1),(2), (3),(6), and (7).  (Counterclaims ¶¶ 111-12.)  Bartelstein testified, however, that he has no supporting evidence (UF 59-60):

> **Q**:  This [Section 502 claim] seems to suggest he [Mintz] broke into your computer system and took something.
>
> **A**:  Yeah, yeah, I don't think he did that.

He further testified that he has no evidence that Mintz deleted or destroyed any information belonging to Priority Sports.  (*Id.*)

**I.   Defamation and Trade Libel against Mintz**

Defamation consists of a false and unprivileged publication tending to injure one's occupation.  *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 695 (2012).  "The sine qua non of recovery for defamation … is the existence of a falsehood.  Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability."  *Id.*  The same is true for trade libel.  *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010-11 (2001).  An "opinion" is any statement which "do[es] not imply facts capable of being true or false."  *Gardner v. Martino*, 563 F. 3d 981 (9th Cir. 2009).  Claims based on "broad, unfocused, and wholly subjective comment[s]" fail as a matter of law.  *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359, 1383 (1999).  Whether a statement constitutes fact or opinion is a question of law.  *Jensen v. Hewlett Packard Co.*, 14 Cal. App. 4th 958, 971 (1993).

Priority Sports and Bartelstein base their defamation and trade libel counterclaims on "information and belief" and hearsay.  *See W. Shoe Gallery, Inc. v. Duty Free Shoppers, Ltd.*, 593 F. Supp. 348, 351 n.3 (C.D. Cal. 1984) (declining to consider evidence in the form of interrogatory responses based "only on information

23

1   and belief" because such evidence "does not meet the requirements of [Fed. R. Civ.

2   P.] 56").

3         Each alleged statement is non-actionable opinion.  Priority Sports asserts "on

4   information and belief" that Mintz told industry blogger Darren Heitner that another

5   employee was leaving Priority Sports.  (UF 61.)  This statement is hearsay.  And, in

6   any event, the statement was true.  (UF 62.)  *See Campanelli v. Regents of Univ. of*

7   *Cal.*, 44 Cal. App. 4th 572, 581 (1996) (truth is a complete defense).

8         Priority Sports also asserts "on information and belief" that Mintz made one

9   or more of the following statements to NBA players George, McGuire, and/or Nick

10   Young, and/or their "family, friends, and advisors":  (i) there would be a "mass

11   exodus" of players from Priority Sports; (ii) Mintz "did all the work" and Bartelstein

12   "only came in at the last minute to get his name in the paper"; (iii) Priority Sports

13   "was going to fall apart" because of Mintz's departure; (iv) Mintz and Bartelstein

14   were "butting heads on everything"; (v) there would be a "mass exodus" of

15   employees from Priority Sports, and Priority Sports employee Reggie Brown was

16   going to join Mintz at CAA; (vi) Mintz was "taken advantage of" at Priority Sports

17   because he was paid only $125,000 and Bartelstein took 50% of everything Mintz

18   brought in; (vii) Bartelstein did not have certain players' "best interests" in mind;

19   (viii) Bartelstein "favored" NBA player Gordon Hayward ("Hayward") over

20   George; (iv) Bartelstein "favored" NBA players Brandon Rush ("Rush") and Carl

21   Landry ("Landry") over McGuire; (x) Bartelstein thought that George was "nothing

22   special" as a basketball player and Hayward "would be a much better player";

23   (xi) Bartelstein did "everything in his power" to make sure that Hayward was

24   drafted ahead of George; (xii) Bartelstein was "more concerned" about Rush and

25   Landry than McGuire; (xiii) Bartelstein had "too many" clients; (xiv) Bartelstein

26   was "not concerned" about have "relationships" with players, only relationships

27   with teams; (xv) Mintz, not Bartelstein, had the "relationships" with the players; and

28   (xvi) Bartelstein was "just a figurehead" and Mintz "did all the work."  (UF 63.)

24

1     Each statement is an opinion that is "[in]capable of being proved true or

2  false." *See Nygard*, 159 Cal. App. 4th at 1053 (no defamation where employee's

3  statements that he "slaved" without a break and that employer wanted him to "work

4  [a]round the clock" were merely "a colorful way of expressing [the employee's]

5  opinion that [the employer] was an overly demanding boss"); *Mandicino v.*

6  *Maggard*, 210 Cal. App. 3d 1413, 1420, 258 (1989) (statements concerning future

7  events were not subject to proof of truth or falsity, and, therefore, not defamatory).

8       **J.**    **Conspiracy against Mintz and CAA**

9     California law does not recognize an independent cause of action for

10  conspiracy. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510

11  (1994). A claimant must show that a "wrongful act itself [was] committed and

12  damage results therefrom." *Mehrtash v. Mehrtash*, 93 Cal. App. 4th 75, 82 (2001).

13  As demonstrated above, Priority Sports cannot establish a wrongful act.

14       **K.**    **Unfair Business Practices against Mintz and CAA**

15     Priority Sports' claim under the UCL fails because neither Mintz nor CAA

16  violated an underlying, predicate law. *See Walker*, 98 Cal. App. 4th at 1169.

17                    **CONCLUSION**

18     For the foregoing reasons, Mintz and CAA respectfully request that the Court

19  enter an order granting:  (i) partial summary judgment in favor of Mintz on the

20  complaint; and (ii) summary judgment or, alternatively, partial summary judgment,

21  in favor of Mintz and CAA on the counterclaims.

22  DATED: October 1, 2012     Anthony J. Oncidi
23                           Robert H. Horn
                             Christopher L. Williams
24                           Susan L. Gutierrez
                           PROSKAUER ROSE LLP
25

26                 By: _____/s/_____
                           Anthony J. Oncidi
27                 Attorneys for Plaintiff and Counterdefendant Aaron
                  L. Mintz and Counterdefendant Creative Artists
28                 Agency, LLC