UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE | |
|---|---|---|
| Paul M. Cruz | N/A | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: | |
| N/A | N/A | |

**Proceedings:**     IN CHAMBERS ORDER re:
           [119]   MOTION for Order for an Award of Reasonable Attorneys' Fees
                   Pursuant to Cal. Civ. Code §3426.4

## I.    INTRODUCTION

Counterdefendant Creative Artists Agency ("CAA") filed this motion to recover attorneys' fees incurred to defend against a counterclaim for misappropriation of trade secrets, and derivative counterclaims, brought by defendants and counterclaimants Mark Bartelstein & Associates, Inc. d/b/a Priority Sports & Entertainment ("Priority Sports"), and Mark Bartelstein (collectively, "Defendants"). For the reasons set forth below, the motion is GRANTED in part.

## II.   BACKGROUND

This case arose when Plaintiff Aaron Mintz ("Mintz") resigned from Priority Sports to join CAA, a competing sports agency. On March 23, 2012, Mintz filed this action against Defendants, seeking a declaration that the non-compete clause of his employment contract with Priority Sports was unenforceable. On April 6, 2012, Mintz filed a separate complaint alleging that following his resignation, Defendants had engaged in a course of illegal retaliatory conduct, including hacking into his personal e-mail account.

In response, Defendants filed a counterclaim alleging that Mintz and CAA conspired to improperly solicit Priority Sports' clients by misappropriating Priority Sports' trade secrets.

                                                                                                :
                                               Initials of Preparer          PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

(Counterclaim ¶¶ 3-4).[1] Specifically, Defendants brought a counterclaim against Mintz and CAA for misappropriation of trade secrets under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426.1. (Id. ¶ 81). In addition, Defendant alleged nine related claims that stem from the alleged trade secret misappropriation: (1) breach of contract against Mintz; (2) breach of the covenant of good faith and fair dealing against Mintz; (3) breach of the duty of loyalty against Mintz; (4) intentional interference with contractual relations as to CAA; (5) intentional interference with present and prospective economic advantage and business relationships against CAA and Mintz; (6) conversion against Mintz; (7) violation of California Penal Code § 502 against Mintz; (8) conspiracy against CAA and Mintz; and (9) violation of California Business & Professions Code § 17200 *et seq.* against CAA and Mintz. (Dkt. 9). Only the remaining counterclaims for defamation and trade libel were not based in whole or in part on the alleged trade secret misappropriation.

On November 1, 2012, the Court granted CAA's and Mintz's motion for summary judgment as to all of Defendants' counterclaims. (Dkt. 81). In its order, the Court observed that Defendant "failed to offer evidence of any specific instance of misappropriation," and their opposition papers were "utterly devoid of evidence that [Mintz] or CAA misappropriated any trade secrets belonging to Priority Sports." (Id. at 20). CAA seeks attorneys' fees on the ground that Defendants knew "from start to finish" that they had no evidence of trade secret misappropriation, and yet continued to pursue such counterclaims.

## III. BAD FAITH

CAA claims attorneys' fees under Cal. Civ. Code § 3426.4. Section 3426.4 provides that "[i]f a claim of misappropriation is made in bad faith . . . the court may award reasonable attorney's fees to the prevailing party." The word "made" means both the commencement and the prosecution of a claim. Stilwell Development Inc. v. Chen, No. CV86–4487–GHK, 1989 WL 418783, at *3 (C.D. Cal. 1989). As there is no dispute that CAA is a prevailing party on the trade secret misappropriation claim, the question is whether Defendants made that claim against CAA in bad faith.

Although the CUTSA does not define "bad faith," courts have interpreted the term to require two parts: (1) objective speciousness of the plaintiff's claim; *and* (2) subjective bad faith in bringing or maintaining the claim. Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc., 116 Cal. Rptr. 2d 358,

---

[1] Defendants filed two sets of counterclaims, on April 17, 2012 in Case No. 12-2554, and on April 25, 2012 in Case No. 12-3055. The Court subsequently consolidated the cases, including the two sets of counterclaims. The sole difference between the two pleadings was the addition of Bartelstein as a counterclaimant in the later-filed document. All paragraph citations herein refer to the document filed in the lead case.

|  | : |  |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

368 (Ct. App. 2002) (emphasis added).  Because an award of attorneys' fees constitutes a sanction, a district court has broad discretion in imposing a fee award.  Id.  The Court discusses each prong of the bad faith analysis in turn.

    A.    **Objective Speciousness**

"Objective speciousness exists where the action superficially appears to have merit but there is a complete lack of evidence to support the claim."  SASCO v. Rosendin Elec., Inc., 143 Cal. Rptr. 3d 828, 834 (Ct. App. 2012) (citing FLIR Sys. Inc. v. Parrish, 95 Cal. Rptr. 3d 307, 313-14 (Ct. App. 2009)).  Under this standard, CAA is not required to "prove a negative (i.e., that they did not steal [Defendants'] trade secrets)."  Id. at 837.  It is enough for CAA to "point to the absence of evidence of misappropriation in the record."  Id.[2]

Defendants claim to own trade secrets in their (1) clients' names and contact information; (2) the key decision-makers surrounding a player; (3) specific data about each client's preferences in marketing, team and city selection, trainers, medical needs, personal family needs, and other sensitive information; and (4) client lists, business plans and strategies, financial information, and personal information.  (Opp. at 13).  However, the record contains no proof that these purported trade secrets are worth anything.  The only evidence supplied was Bartelstein's general assertion that Priority Sports invests "significant time and money" into this information, and that the information is "highly valuable to [Priority Sports'] success."  (Salvaty Decl., Ex. I ("Bartelstein SJ Decl.") ¶¶ 13-14).  Such broad and conclusory statements fail to demonstrate that the data had economic value.  "When information has no independent economic value, a claim for misappropriation lacks merit."  Gemini, 116 Cal. Rptr. 2d at 368 (affirming fee award under § 3426.4 where purported secrets lost any economic value before complaint was filed); see also CRST Van Expedited, Inc. v. Werner Enters., Inc., 479 F.3d 1099, 1112 (9th Cir. 2007) (affirming fee award under § 3426.4 where there was "no proof in the record that [purported secrets] are worth anything").  Therefore, this deficiency alone warrants a finding of objective speciousness.

---

    [2]  Misappropriation includes acquiring a trade secret with knowledge that the secret was obtained by improper means, or using a trade secret with the knowledge that the secret was "derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use."  Cal. Civ. Code § 3426.1(b).  A "trade secret" is "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

Even assuming the foregoing constitute trade secrets, there is no evidence that CAA misappropriated anything. The Court already held in its summary judgment order that Defendants had failed to adduce any evidence of misappropriation. Defendants did not challenge that ruling, so the Court need not reconsider it here. Nevertheless, Defendants now point to the following parts of the record that supposedly contain evidence of misappropriation: (1) two draft emails from Mintz to himself; (2) the deceptive manner in which Mintz resigned from Priority Sports; (3) the alleged fact that Mintz disclosed to CAA information relating to Priority Sports' commissions splits (or referral fees) for specific clients; and (4) the deposition testimony of Mintz and Floyd Johnson. The Court examines these items of evidence below and concludes that none serve as proof of misappropriation.

  1. <u>Mintz's Draft Emails</u>

First, Defendants contend that two draft[3] emails in Mintz's business account, introduced for the first time at trial, suggest that Mintz had shared confidential information about Priority Sports' clients with CAA. Both emails apparently contain Mintz's notes to himself. The first email, dated February 29, 2012, reads as follows:

> Pacers. Home tues march 6th-thurs 8th (leave fri)
>
> Team? How do we communicate? Integrate? In and out of dept
> I bring in player? Who do they need to know?
> Marketing? Big and small? Lloyd?
> Mtgs? Bring marketing guys?
> How do you envision this working btw me you LR and HT
> 3-5yrs from now?
> I am pretty self sufficient. Do you see anything bogging me down? Inner IFC mtgs? Also, you mentioned you would shield me from stuff. I need that
> How much of a voice will I have if I see things that we need to add. I want to make sure I am a senior
> part of this department.
> I really think my talent and your talents mesh very well.
> *Other services priority provides for our current guys? How can we keep that?*
> Serviced to same extent will be a concern of theirs.comfort to the current guys?
> LR have called twice. No response. How much of a relationship should I have their?
> I think my niche will be 5-20 in draft and also 4percent contract guys vets
> Any other additions I want to have input on
> Limits on who I can take? Pay for training? I can really build this up from the draft up

---

  [3] "Draft" means the email was never sent. (Salvaty Decl., Exs. G, H).

                                               :

Initials of Preparer        PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

Expenses?
Marketing guarantees

(Salvaty Decl, Ex. G ("Exhibit 508")) (emphasis added).

The second email, dated March 7, 2012, contains a similar list:

Insurance
Travel budget/expectations
Training or orientation?
*Percentage deals with handlers*
401k matching
Assistant - travel, client maintenance
face time
Marketing? Materials?
Other services
Gym membership, car and clothing allowance
Cell phone
Expense reimbursement procedure
Computer
Dress Code

No call lr?
Office space? When ready based on 19th
Asst?
*Plan on clients?*
*Any reason I shouldn't book flight provided tony good with it?*

(Salvaty Decl, Ex. H ("Exhibit 509")) (emphasis added).

In Defendants' view, these emails demonstrate that Mintz used trade secrets to solicit Priority Sports players to follow him to CAA. In particular, Priority Sports' general counsel, Rick Smith, suggested at trial that the "flight" refers to Mintz's plan to visit the Indiana Pacers basketball team, since Exhibit 508 mentions that the team would be Indiana from March 6-8, 2012. Smith further surmised that CAA was involved because "tony" was a reference to Tony Oncidi, Mintz's and CAA's outside counsel. (Id., Ex. F at 13). Accordingly, Smith concluded that Mintz must have decided to go to Indiana to solicit clients of Priority Sports to follow him to CAA.

These emails do not bear the inference Defendants propose. To begin, Smith's theory is pure

:

Initials of Preparer     PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

speculation. His contention that the "flight" referenced in Exhibit 509 proves that Mintz traveled to visit the Pacers is mere conjecture. The Court has detected no evidence that Mintz actually visited Indiana in March 2012, much less that any players on the Pacers left Priority Sports to join CAA as a result. Moreover, even if Mintz did visit the Pacers, there is no evidence that he used any of Priority Sports' trade secrets to solicit players for CAA, or that he disclosed any trade secrets to CAA. In this regard, Defendants' reliance on passing references to "services" and "percentage deals with handlers" is misplaced. The logical inference is that these emails are lists of factors that Mintz pondered to himself, presumably in connection with his decision to join CAA. This is a far cry, however, from evidence that CAA misappropriated Priority Sports' trade secrets.

First, although Exhibit 508 mentions "services" for "current clients," there is no evidence that any "services" of Priority Sports are trade secrets that carry economic value. Moreover, given that Exhibit 508 is a draft email from Mintz to himself, there is no basis to conclude that Mintz shared information about these "services" with CAA; at most, he wondered if the clients would have similar services at CAA. Thus, there is no evidence that CAA was involved at all.

Second, the reference in Exhibit 509 to "percentage deals with handlers" does not constitute proof of misappropriation. At most, it shows that Mintz considered this as a factor among the terms of employment at CAA, such as whether the agency provided 401k matching, gym membership, or a cell phone. At bottom, the emails fail to prove that CAA acquired or used any purported trade secret. Smith's speculation to the contrary is not evidence of misappropriation. See SASCO, 143 Cal. Rptr. 3d at 837 ("Speculation that the individual employees must have taken trade secrets from [plaintiff] based on their decision to change employers does not constitute evidence of misappropriation."). Accordingly, the Court finds that these emails do not constitute evidence of misappropriation.

   2. Mintz's Resignation

Second, Defendants argue that Mintz's abrupt departure from Priority Sports supported their suspicion that Mintz and CAA had used Priority Sports trade secrets to gain a competitive advantage. In particular, Defendants complain that Mintz resigned without giving two weeks notice and without informing Priority Sports about the status of his clients or assisting in the transition of his clients to other agents in Priority Sports. Further, Defendants lament that when Bartelstein initially asked Mintz on March 23, 2012 whether he was planning to resign, Mintz lied about his intentions. Even crediting these allegations, they show at most that Mintz handled his departure poorly. There is no evidence, however, that he or CAA misappropriated any of Priority Sports' purported trade secrets.

//

|  | : |  |
|---|---|---|
|  | Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

### 3. Disclosure of Commission Splits/Referral Fees

Next, Defendants contend that CAA's corporate representative, Steve Heumann, testified in his deposition that Mintz, while still employed at Priority Sports, disclosed to CAA that Priority Sports paid 20 percent of its commission as a referral fee to one of the "handlers" of a Priority Sports client, Paul George.[4] Heumann further suggested that Mintz said that CAA would need to match that fee structure in order to enlist George. (Salvaty Decl, Ex. C ("Heumann Depo.") at 53-54, 118-123). This argument would have more force, but for the fact that Priority Sports' commission splits with handlers are not trade secrets. There is no evidence that Priority Sports took reasonable steps to ensure the confidentiality of the terms of these referral fees. In fact, it is undisputed that the side letters used by Priority Sports do not contain a confidentiality provision. (See Dkt. 71 at 18-19; Dkt. 71-1 ¶ 40). Further, it is undisputed that Jason Chambers, the brother-in-law to Priority Sports client Paul George, read and knew the contents of a side letter between Priority Sports and George's handler Sedric Toney. (Dkt. 71-1 ¶ 41). In view of this evidence, Mintz's disclosure to CAA did not constitute misappropriation because there was no trade secret to divulge in the first place. Moreover, the Court has located no evidence that George, or any other client, left Priority Sports and joined CAA as a result of any disclosure of their handler's fee. Accordingly, Heumann's testimony fails to provide evidence of trade secret misappropriation by CAA.

### 4. Deposition Testimony

Finally, Defendants argue that proof of misappropriation lies in selected excerpts from the deposition testimony of Mintz. According to Defendants, Mintz admitted to using his Priority Sports' contact list to solicit Priority Sports' clients on behalf of CAA. This is inaccurate. According to the transcript, although Mintz did use Skype to place or receive calls with Priority Sports clients, there is no evidence that he solicited them for CAA on those calls, that CAA knew such calls were being placed, or that CAA had access to the Skype account. (Salvaty Decl., Ex. B ("Mintz Depo.") at 8-10, 337-39, 367-68). Thus, there is no evidence of misappropriation by CAA.

Defendants also point to the deposition testimony of Floyd Johnson, an associate of Taj Gibson, another Priority Sports client. According to Johnson's deposition testimony, Mintz called Johnson

---

[4] Mintz adduced uncontroverted evidence at the summary judgment stage explaining the commission split structure. An agent's commission typically is limited to 4 percent of a player's compensation. However, an agent may enter into a "side letter" to pay a percentage of his commission to a third party, known as a "handler," who is typically a key decision maker such as the client's relative, friend, or trainer. (Dkt. 50 ("Mintz SJ Decl.") ¶ 34).

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

before his resignation on March 23, 2012, to inform Johnson that he would be moving to CAA and that "it would be a good place" for Taj Gibson (and Johnson) to go.  (Salvaty Decl., Ex. J ("Johnson Depo.") at 13-16).  Conspicuously absent from this testimony, however, is any evidence that CAA used or acquired any trade secrets, or that CAA knew or had reason to know that Mintz would be making the call.  Therefore, there is no evidence of misappropriation by CAA.

                                              *      *      *

In sum, the Court once again has found no evidence in the record that CAA engaged in trade secret misappropriation.  Accordingly, the Court concludes that Defendants' misappropriation claim against CAA was objectively specious.

    **B.**    **Subjective Bad Faith**

Subjective bad faith means that the "action was commenced or continued for an improper purpose."  SASCO, 143 Cal. Rptr. 3d at 847.  "A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence."  Gemini, 116 Cal. Rptr. 2d at 369.  Thus, subjective bad faith "may be inferred by evidence that [the counterclaimants] intended to cause unnecessary delay, filed the action to harass respondents, or harbored an improper motive."  FLIR Sys., 95 Cal. Rptr. 3d at 315.  If a court determines that a party acted with the intention to produce any such result, "the improper motive has been found, and the court's inquiry need go no further."  Gemini, 116 Cal. Rptr. 2d at 369.  In addition, "[t]he timing of the action may raise an inference of bad faith."  FLIR Sys., 95 Cal. Rptr. 3d at 315.  For example, subjective bad faith may be inferred "where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised." Gemini, 116 Cal. Rptr. 2d at 369 (internal quotation marks omitted).

Stilwell aptly discusses the factors indicative of subjective bad faith.  To begin, the district court noted a complete lack of evidence that the plaintiff's purported trade secrets had been confidential, were the subject of efforts to maintain their secrecy, much less that they had been misappropriated.  1989 U.S. Dist. LEXIS 5971 at *4.  From this dearth of evidence, the court inferred subjective misconduct, reasoning that "plaintiffs had superior, if not exclusive knowledge of whether they undertook any effort to maintain the alleged trade secrets."  Id. at *4.  The court added that by the time defendant hired special counsel, "plaintiffs knew that they had no proof of any trade secret misappropriation.  Yet, they persisted in the claim through their case in chief."  Id. at *5.  "This knowing persistence in an invalid claim," the court found, "also demonstrates plaintiffs' subjective bad faith in causing the needless expenditure of money in defense of the trade secret claim."  Id.

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

      Similar factors supported a finding of subjective bad faith in Computer Econs., Inc. v. Gartner Group, Inc., 1999 U.S. Dist. LEXIS 22204 (S.D. Cal. Dec. 14, 1999). There, the court granted summary judgment to the defendants, concluding that the plaintiff presented no evidence that its allegedly confidential information qualified as trade secrets, or that the defendants had used or disclosed such information. Id. at *4. In granting defendant's motion for attorneys' fees under section 3426.4, the court found subjective bad faith based in part on the aforementioned lack of evidence. Id. at *4-5 ("A court may find subjective misconduct by relying on direct evidence of plaintiff's knowledge during certain points in the litigation and may also infer it from the speciousness of plaintiff's trade secret claim and its conduct during litigation."). Additionally, the court's finding of subjective bad faith was based on the following direct and circumstantial evidence: (1) the defendant put the plaintiff on notice that the alleged trade secrets were not specific enough to qualify to protection; and (2) during the deposition of the plaintiff's Rule 30(b)(6) witness, the only asserted basis for misappropriation was that the defendant copied the title of one of the plaintiff's newsletters. Id. at *19-20.

      Based on comparable evidence in this case, the Court finds that Defendants maintained the misappropriation claim against CAA in subjective bad faith. To begin, as in Computer Econs., Defendants' complete lack of evidence of trade secret protection supports the inference that they knew their claim lacked merit. See VSL Corp. v. General Techs., No. C 96-20446 RMW, 1998 U.S. Dist. LEXIS 7377, at *8 (N.D. Cal. Jan. 5, 1998) ("As to subjective misconduct, the court inferred subjective misconduct from plaintiffs' total failure of proof."). Despite being in the best position to assess whether their confidential information constituted trade secrets, and despite having six months after filing their counterclaim to make this determination, Defendants were unable to identify on summary judgment the alleged trade secrets with specificity or demonstrate their economic value. This bolsters the inference that Defendants knowingly prosecuted a specious misappropriation claim.

      Next, CAA repeatedly put Defendants on notice that the alleged trade secrets were not specific enough to qualify for trade secret protection. On August 27, 2012, when asked to describe each piece of confidential information that CAA allegedly misappropriated, Defendants protested that the question was "premature" and therefore vaguely mentioned information stored in their "customer lists," such as "recruiting plans and strategies," "career options and strategies," "special requirements," "interests and preferences of clients," and "domestic and international consultants and preferred service providers (such as sports doctors)." (Horn Decl. ¶ 27, Ex. G ¶¶ 8-13). Yet when pressed to identify any documents containing such secrets that were allegedly misappropriated, Defendants responded that such documents were in Mintz's control, essentially conceding that they had no such documents. (Id.).

      Furthermore, on August 30, 2012, when asked to state the grounds of their affirmative defenses, CAA notified Defendants of its position that "Priority Sports has not identified any protectable trade

                                                                                 :

Initials of Preparer                        PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

secret, proprietary, or confidential information." (Horn Decl. ¶ 28, Ex. H at 6). Later, Defendants essentially conceded that they had failed to identify any trade secrets with adequate specificity. When CAA argued on summary judgment that Defendants' alleged trade secrets — "recruiting strategies," "player preferences," and "providers of services" — were known widely in the basketball industry, Defendants objected that these catch-phrases "lack[ed] any specificity." (Dkt. 71-1 ¶ 32). Yet these phrases were stated at the same level of generality in Defendants' *own* prior description of their alleged trade secrets. (Salvaty Decl., Ex. I ("Bartelstein SJ Decl.") ¶¶ 13-14) (describing trade secrets vaguely as "client preferences in marketing," "trainer preference," and "business plans and strategies"). Thus, Defendants knew as early as August 27, 2012, that their alleged trade secrets were too amorphous to warrant protection.

Finally, on August 29, 2012 – four and half months after filing the counterclaims and more than two months before trial – Bartelstein, testifying as Defendants' Rule 30(b)(6) witness, admitted at his deposition that Defendants still had no proof of misappropriation, and that their only basis for the claim was pure speculation. The transcript reads as follow:

> Q. And do you have any facts to suggest, prove or otherwise indicate that Mr. Mintz provided any confidential business information, either in tangible form or orally to CAA prior to his departure from Priority Sports?
> A. At this time, no.
> Q. What about since his departure from Priority Sports, [do you have] any evidence, facts, to suggest that Mr. Mintz provided proprietary business information of Priority Sports to CAA?
> A. Well, he certainly, as I said before, was listening in to all of our recruiting meetings, knew all of the contacts, knew our strategies, knew the relationships, knew everything that we were doing in terms of those players that we were going after this year and in future years, future prospective clients. So, that's information that I'm – I would think he has probably shared. I can't prove it, but my guess is that he has.
> Q. But that's speculation on your part, correct?
> A. Yeah, it sure is.
> Q. Anything that's not speculation?
> A. Anything that's not speculation?
> Q. With respect to proprietary, confidential, trade secret information that Mr. –

|  | : |  |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

> A. No.
> Q. – Mintz has ever provided to CAA that belonged to Priority Sports?
> A. Not that I can think of at this point.
> …
> Q. But have you – have you seen any evidence that would suggest that information [that] was somehow confidential, proprietary and owned by Priority Sports somehow made its way into CAA's business?
> A. No.

(Horn Decl. ¶ 31, Ex. L at 195-97, 211). Bartelstein's mere suspicion that Mintz and CAA misused Priority Sports' trade secrets is insufficient to avoid a finding of subjective bad faith. See FLIR, 95 Cal. Rptr. 3d at 317 ("All that is alleged, at bottom, is that defendants could misuse plaintiff's secrets, and plaintiffs [sic] fear they will. That is not enough." (internal quotation marks omitted)).

    In view of the foregoing, there is ample evidence that although Defendants knew as late as August 29, 2012, that they lacked evidence of misappropriation by CAA, they continued to pursue this cause of action, requiring its treatment in CAA's motion for summary judgment filed on October 1, 2012. (Dkt. 48). It is firmly established that pursuing a trade secret claim through a dispositive motion without any basis demonstrates subjective bad faith. See VSL, 1998 U.S. Dist. LEXIS 7377, at *11 (finding subjective bad faith where plaintiff's failure to timely withdraw unsupported misappropriation claim "necessitated their treatment in defendant GTI's motion for summary judgment"); CRST Van Expedited, 479 F.3d at 1112 (finding subjective bad faith where plaintiff was warned that the claim was specious but refused to withdraw the claim until after defendant filed its motion to dismiss); Gemini, 116 Cal. Rptr. 2d at 369 (subjective bad faith may be inferred "where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised" (internal quotation marks omitted)). Accordingly, the Court finds that, after August 29, 2012, Defendants maintained the misappropriation claim in subjective bad faith.

    To conclude, the Court concludes that Defendants' subjective bad faith, coupled with the objective speciousness of their trade secret misappropriation claim, amount to bad faith under § 3426.4. Therefore, an award of reasonable attorneys' fees is warranted for the costs incurred in defending CAA against this claim after August 29, 2012.

## IV. ATTORNEYS' FEES

    Pursuant to § 3426.4, CAA has requested attorneys' fees totaling $541,929.38 incurred in

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

defending against the misappropriation counterclaim and related counterclaims, and an additional $29,978.55 incurred in preparing this motion. CAA's submission is defective with respect to both the rates charged and the hours billed.

    A.    **Hourly Rates**

"To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—*in addition* to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Camacho v. Bridgeport Financial, Inc., 523 F.3d 973, 980 (9th Cir. 2008) (emphasis added) (internal quotation marks omitted). To this end, "[a]ffidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community, and rate determinations in other cases . . . are satisfactory evidence of the prevailing market rate." Id. (internal quotation marks omitted).

Here, CAA's counsel of record asserts in conclusory fashion that the hourly rates of the members of his team have been competitive with, or lower than the prevailing rates among attorneys of similar caliber, education, and experience in the community. (Horn Decl. ¶¶ 16-17). This assertion, while minimally probative, falls short of the type of showing called for in Camacho.

    B.    **Hours Requested**

The Court also rejects the total hours requested. CAA contends that its counsel reasonably incurred $541,929.38 in defending against the trade secret misappropriation counterclaim and nine related counterclaims. In CAA's view, apportionment of time between the misappropriation claim and the related counterclaims is "not appropriate where, as here, precise segregation is not possible given the inherent overlap of issues." (Mot. at 14).

CAA's contention finds some facial support in VSL Corp. v. General Techs., No. C 96-20446 RMW, 1998 U.S. Dist. LEXIS 7377 (N.D. Cal. Jan. 5, 1998). There, upon a finding of bad faith under section 3426.4, the court awarded attorneys' fees to defendant for the costs incurred in defending both the trade secret claim, as well as ten counterclaims that were "factually related and intertwined with the trade secret [claim.]" Id. at *18. The court began with the observation that "the apportionment of fees is within the trial court's discretion." Id. at *17. It reasoned that because "the fees incurred to defend these claims are inextricably intertwined, segregation or apportionment of fees is not appropriate or necessary." Id. (citing Abdallah v. United States Savings Bank, 43 Cal. App. 4th 1101, 1111 (1996) (court need not apportion fees when claims are "inextricably intertwined" and it is "impracticable, if not

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

impossible, to separate the multitude of conjoined activities into compensable or noncompensable time units"). Here, however, the Court exercises its discretion and declines to apply VSL.

VSL is distinguishable because the ancillary claims in that case were clearly dependent upon the core allegation of trade secret misappropriation. There, the plaintiff provided defendant with information about how to build a particular construction duct with the understanding that defendant would build it exclusively for plaintiff. According to plaintiff, however, defendant then used the "secret" information to build the same ducts for plaintiff's competitor. 1998 U.S. Dist. LEXIS 7377 at *2-4. From these alleged facts, plaintiff asserted the following claims: (1) misappropriation of trade secrets, (2) misappropriation of confidential and proprietary data, (3) conversion, (4) violation of the Uniform Trade Secrets Act, (5) unfair competition, (6) violation of the California unfair competition statute, (7) unjust enrichment, (8) breach of confidence, (9) breach of contract and (10) breach of implied contract. Id. at *1-2. Though the claims were distinct in a doctrinal sense, it is plain that each claim was founded upon the same factual predicate, i.e. defendant's alleged misuse of plaintiff's information.

Here, by contrast, the other counterclaims were not comparably dependent upon the alleged misappropriation by CAA. As an initial observation, the Court rejects CAA's premise that nine other counterclaims were related to the misappropriation claim. As the Court has alluded to previously, the instant fee motion was brought by CAA, not Mintz. (Mot. at 1:3-9). Thus, having determined that Defendants maintained the action in bad faith against *CAA*, the relevant inquiry here is what fees were reasonably incurred in defending *CAA* against the misappropriation claim and any related claims.[5] Apart from the misappropriation claim, only *four* other counterclaims were brought against CAA: (1) intentional interference with contractual relations, (2) intentional interference with present and prospective economic advantage and business relationships, (3) conspiracy, and (4) unfair competition.

In reviewing these four counterclaims, however, the Court holds that none were so "inextricably intertwined" with the misappropriation claim as to warrant their inclusion in a fee award. Rather, each of the four counterclaims was premised on the variegated allegation that CAA induced Mintz (1) to work for CAA while still employed by Priority Sports; (2) to solicit Priority Sports' clients while still employed there; and (3) to misappropriate both trade secrets and other *non*-secret confidential information on behalf of CAA while still employed by Priority Sports. (Counterclaim ¶¶ 93, 100, 133-34, 140). Thus, while the alleged misappropriation by CAA formed a part of these counterclaims,

---

[5] In other words, there is no motion before the Court to recover Mintz's attorneys' fees on the ground that Defendants sued Mintz in bad faith. In any event, the deadline for Mintz to file a fee motion has passed. See Fed. R. Civ. P. 54(d)(2)(B)(i).

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

unlike in VSL, it did not constitute the gravamen of every counterclaim. On the contrary, CAA's counsel necessarily would have had to —and did—defend CAA against the various other factual charges underlying each claim, irrespective of whether Defendants had pursued the trade secret misappropriation claim. Since CAA should have paid these fees in any event, granting a fee award covering all four counterclaims would effectively give CAA a windfall. Such a result is inconsistent with the purpose of section 3426.4. In Stilwell, the court noted the legislative history of section 3426.4 shows it is intended to "allow[ ] a court to award reasonable attorney fees to a prevailing party in specified circumstances as a ***deterrent*** to specious claims of misappropriation." 1989 WL 418783, at *3 (internal citation and quotation marks omitted) (emphasis added). Granting an overcompensatory award, however, goes beyond deterrence and may possibly chill future parties' desire to file a misappropriation claim if it facially relates to other claims.[6]

Under these circumstances, the Court concludes that the other counterclaims against CAA were not sufficiently intertwined with the misappropriation claim to justify recompense of fees incurred in repelling them. Accordingly, to carry its burden for a fees award, CAA must apportion the hours reasonably expended only in defending CAA against the misappropriation claim after August 29, 2012.[7]

**V.     CONCLUSION**

The Court finds that Defendants maintained the trade secret misappropriation claim against CAA in bad faith after August 29, 2012. Accordingly, CAA is entitled to attorneys' fees incurred in defending against only the misappropriation claim during the relevant time period. Because the instant motion is deficient, however, CAA shall have fourteen (14) days to file an amended fee motion that

---

[6] Even if it were to consider all the counterclaims against CAA, the Court is skeptical why it was necessary for CAA's counsel to assign two experienced partners, a senior associate, and a mid-level associate on a case as straightforward as this. In their amended fee motion, described further below, CAA must provide declarations from each billing attorney setting forth their prior experience with cases involving similar trade secret claims.

[7] The Court recognizes that apportionment may not be mathematically precise with respect to certain tasks. Nevertheless, the burden rests with CAA to provide reasoned estimates of the portion of time spent defending the trade secret misappropriation claim. As an example, if CAA's counsel drafted an interrogatory comprising twenty questions, but only five questions addressed the trade secret misappropriation claim, then the hours billed to the task of drafting the interrogatory should be discounted proportionately. The Court shall only award fees where it is reasonably clear that the hours requested were billed in defending against the misappropriation claim.

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-02554-SVW-SS (2:12-cv-03055-SVW-SS) | Date | June 14, 2013 |
|---|---|---|---|
| Title | Aaron Mintz v. Mark Bartelstein and Associates Inc et al. | | |

apportions the hours spent defending the misappropriation claim against CAA, and which is accompanied by the documentation and affidavits relevant to support both the requested hourly rates and the reasonable hours billed. To the extent CAA employs any methodology to calculate the apportionment, it must provide declarations to explain such methodology. Failure to file an amended motion by the deadline will result in denial of fees. If CAA files its amended motion, Defendants may file an opposition no later than seven (7) days later. No hearing will be scheduled except by further order of the Court.

|  | : |
|---|---|
| Initials of Preparer | PMC |